MODERN MARKETING SERVICE, Inc., et al. v. FEDERAL TRADE COMMISSION.

RED & WHITE CORPORATION et al. v. SAME.

Nos. 8483, 8484.

Circuit Court of Appeals, Seventh Circuit.

June 13, 1945.

Franklin D. L. Stowe, of Buffalo, N. Y., John T. Chadwell, of Chicago, Ill., Jos. C. Dinsmore, of Cincinnati, Ohio, John W. Ogren, L. McBride, Wm. D. McKenzie, and James M. Best, all of Chicago, Ill., Lawrence B. Murdock, of St. Louis, Mo., and Louis L. Rosen, of New Orleans, La., for petitioner Modern Marketing Service.

Dana B. Hellings, of Buffalo, N. Y., for petitioner Red & White Corporation.

Joseph J. Smith, Jr., and John T. Haslett, Asst. Chief Counsel, both of Washington, D. C., for respondent.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

These are petitions to review and set aside a cease and desist order issued by the Federal Trade Commission, for alleged violation of Sec. 2 (c) of the Clayton Act, as amended June 19, 1936 by the Robinson-Patman Act, 15 U.S.C.A. § 13 (c). Petitioners also ask leave to adduce additional evidence in the event their petitions for review are denied. The Commission has filed a cross-petition for enforcement of its order. The petitioners in No. 8483 are Mod-ern Marketing Service, Inc., hereinafter referred to as Modern Marketing; The Diamond Match Company, Morton Salt Company, The Quaker Oats Company, Ralston Purina Company, Wesson Oil & Snowdrift Sales Company, and the Proctor and Gamble Distributing Company, hereinafter referred to as sellers. The petitioners in No. 8484 are Red and White Corporation, hereinafter referred to as Red and White; S. M. Flickinger Company, Inc., Juillard Cockcroft Corporation, Laurans Brothers, Inc., West Coast Grocery Company, H. O. Wooten Grocery Company, and Nash-Finch Company, hereinafter referred to as buyers.

The complaint was issued by the Commission on May 6, 1939, and alleged that Modern Marketing, an Illinois corporation, was engaged in the business of providing purchasing and other services for the buyers, maintaining its principal office and place of business in Chicago, Illinois, with branch purchasing offices in Buffalo, New York and San Francisco, California. The complaint also alleged that Red and White up to October 1, 1936, which was the date of the formation of Modern Marketing, furnished purchasing and other services for the same buyers, with its principal office and place of business in Chicago, Illinois, with branch offices in Buffalo, New York and San Francisco, California; that the sellers named in No. 8483 were engaged in the business of manufacturing, packing and selling groceries, food commodities and allied products in interstate commerce, and that said sellers are fairly typical and representative of a large group or class of manufacturers, processors and producers, engaged in the practice of selling a substantial portion of their commodities to buyers who purchase through Modern Marketing as an intermediary for buyers; and that the buyers named in No. 8484 were engaged in the wholesale grocery business and are stockholders of Red and White. The buyers are representative of a group or class of a large number of wholesale grocers, each of which is a stockholder in Red and White.

The complaint alleged that Red and White was organized on December 27, 1927, and from that period up until October 1, 1936 engaged in the business of providing purchasing and other services for the buyers; that during this period it received orders from its various stockholders to purchase commodities, particularly groceries and foodstuffs, and transmitted such orders

as agent of said buyers to sellers, and as a result thereof goods, wares and merchandise were by the sellers shipped to the buyers and the sellers paid brokerage to Red and White on such purchases. It was alleged that Red and White furnished advertising and promotional services to. the buyers and their retail affiliated food stores, and that the cost of such services performed by Red and White for the buyers and their retail stores prior to October 1, 1936 was defrayed from funds derived from brokerage fees paid by sellers upon such purchases.

The complaint further alleged that Modern Marketing was organized and incorporated on or about October 1, 1936 by former employees of Red and White for the purpose of having it act as the purchasing agent for the stockholders of Red and White, to collect a brokerage fee from sellers and to furnish advertising services for such stockholders; that on or about October 1, 1936, Red and White entered into an agreement with Modern Marketing whereby the brands, trademarks and trade names owned or controlled by Red and White were leased to Modern Marketing for a consideration of $30,000 per year. Also, pursuant to its obligations under the leasing agreement, Modern Marketing thereafter performed the same services for and in behalf of the buyers which were performed for the buyers by Red and White prior to October 1, 1936.

It was also charged that in all the buying and selling transactions the brokerage fees or commissions were paid and transmitted by sellers to and accepted and received by Modern Marketing upon the purchases of buyers while Modern Marketing was subject to the control of Red and White, and was acting in fact for and in behalf of the buyers; and that the brokerage fees and commissions paid to Modern Marketing as intermediary upon the purchases of the buyers were transmitted to and accepted and received by the buyers in the form of services performed by Modern Marketing and Red and White for and in behalf of said buyers.

It was charged that the transmission and payment of such brokerage fees and commissions by sellers to Modern Marketing upon the purchases of buyers while acting for the buyers and under the control of Red and White, and the receipt and acceptance thereof by Modern Marketing, Red and White and the buyers, were in violation of the provisions of Sec. 2 (c), which reads as follows:

"That it shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

Modern Marketing in its answer denied, among other things, that it acts for or in behalf of buyers or that it is subject to the direct or indirect control of Red and White or the buyers, or that it passes on to Red and White or the buyers any of the brokerage fees it collects from sellers upon the purchases of buyers.

Red and White in its answer denied, among other things, that prior to June 19, 1936 (the effective date of the amended Act), it was the purchasing agent for its stockholders. It denied that the receipt of the $30,000 from Modern Marketing was the distribution of brokerage collected by Modern Marketing upon the purchases of its stockholders. Both Modern Marketing and Red and White in their answers alleged that the provision charged to have been violated was unconstitutional.

The sellers filed separate answers, disclaiming knowledge of the facts surrounding the organization and functions of Modern Marketing. They all admitted that upon the purchases of Red and White buyers, they had paid Modern Marketing brokerage fees and commissions,' and prior to the passage of Sec. 2 (c) they had paid brokerage to Red and White upon the purchases of its stockholders. They also alleged that the brokerage fees paid were for valuable services rendered to them.

The buyers filed answers in substantially the same form as that filed by Red and White, except buyer Nash-Finch Company. This buyer admitted that it had placed orders for its requirements of Red and White branded products, prior to the formation of Modern Marketing, through Red and White, and subsequent thereto through Modern Marketing. It alleged, however,

that neither Modern Marketing nor Red and White was its agent and denied that it had received brokerage fees from Modern Marketing or Red and White upon its purchases, either directly or indirectly.

Extended hearings were held before a Trial Examiner for the Commission. 5,487 pages of typewritten testimony were taken, and 1,099 exhibits introduced. The Trial Examiner filed his report June 20, 1941. The case was presented to the Commission on briefs and oral argument May 24, 1943, and the Commission on September 8, 1943 issued its findings, conclusions and the cease and desist order now sought to be reviewed.

As is apparent, the record is voluminous. The same observation may be made as to the briefs which have been filed in this court by the parties in support of their respective contentions. Even to summarize the testimony contained in the record or the numerous theories and contentions advanced before this court would require an almost endless discussion. Furthermore, such a discussion would serve no useful purpose as the findings of the Commission are conclusive if supported by substantial evidence. Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 117, 58 S.Ct. 113, 82 L.Ed. 141, Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, 73, 54 S.Ct. 315, 78 L. Ed. 655. Also, the weight to be given to proven facts and circumstances, as well as the inferences reasonably to be drawn therefrom, are for the Commission. Federal Trade Commission v. Pacific States Paper Trade Assn., 273 U.S. 52, 63, 47 S.Ct. 255, 71 L.Ed. 534.

At this point, it is sufficient to observe that all or at any rate substantially all of the issues raised by the complaint and the answers thereto have been decided adversely to the petitioners by the Commission, and that the Commission has made findings which support its decision on such issues. This, of course, does not dispose of petitioners' contention that many of the material facts found by the Commission are not supported by substantial evidence, and we shall subsequently refer to the proof relied upon by the Commission in support of such findings.

Prior thereto, it appears appropriate to state the contested issues. In this connection, we note that the Commission makes a rather extended argument in favor of the constitutionality of the provision in question and that it is not related to or dependent upon other provisions of Sec. 2 (c). We think we need not enter into any discussion of these questions, as no contention is made before this court by petitioners that the provision is unconstitutional. Nor do petitioners contend other than that the involved provision is separate and independent from the other provisions of the Act. In fact, petitioners in a joint reply brief expressly disclaim that they ever made a contrary contention. Furthermore, the provision has been considered and construed favorably to the Commission in the following cases: Biddle Purchasing Co. et al. v. Federal Trade Commission, 2 Cir., 96 F.2d 687; Oliver Bros., Inc., et al. v. Federal Trade Commission, 4 Cir., 102 F.2d 763; Great Atlantic & Pacific Tea Co. v. Federal Trade Commission, 3 Cir., 106 F.2d 667; Webb-Crawford Co. v. Federal Trade Commission, 5 Cir., 109 F.2d 268; and Quality Bakers of America v. Federal Trade Commission, 1 Cir., 114 F.2d 393. In these cases, the constitutionality of the provision has been sustained, as well as the fact that it is not dependent upon any other provision of the Act for force and validity. Petitioners make no contention that any of these cases have been erroneously decided but rely upon the argument that they are distinguishable and therefore inapplicable to the facts of the instant case.

While the contested issues are stated by the respective parties in different phraseology, we think they mean substantially the same thing. They are (1) whether petitioner Modern Marketing is controlled by Red and White and the buyers; (2) whether petitioner Modern Marketing is acting in fact for or in behalf of Red and White and the buyers; (3) whether petitioner Modern Marketing has distributed brokerage fees collected upon purchases of buyers to Red and White and the buyers; (4) whether sellers have paid brokerage fees and commissions to petitioner Modern Marketing as a buyer controlled intermediary or as an intermediary who acts in fact for and in behalf of the buyer; or (5) whether petitioner Red and White and the buyers have accepted brokerage fees and commissions from sellers through Modern Marketing upon their purchases. The Commission made findings upon which it decided each of these issues adversely to petitioners.

It is well to observe that Red and White is not charged by the Commission with the violation of any law prior to June 19, 1936

(date of the Robinson-Patman Act). It is the position of the Commission, however, that Red and White and the buyers since that date have exercised control over Modern Marketing, that Modern Marketing has acted for the buyers and that Red and White and the buyers have received the benefit of brokerage paid Modern Marketing by sellers in violation of law. Notwithstanding that Red and White is not charged with any law violation prior to June 19, 1936, a large part of the testimony, as well as the findings of the Commission and the argument before this court, is devoted to Red and White. The pertinency of such testimony is based upon the Commission's theory that the business conducted by Red and White was outlawed by the Robinson-Patman Act and that Modern Marketing was organized for the purpose of evading the law, in other words, to accomplish indirectly that which had theretofore been accomplished by Red and White. On this theory, the Commission places great stress upon the similarity of the operation by Modern Marketing as compared with that theretofore followed by Red and White.

Red and White on the other hand contends that Modern Marketing was organized not for the purpose of evading the law but in a good faith attempt to comply with it. It admits that it was a buyer controlled organization and for that reason came within the proscription of Sec. 2 (c). It strenuously disclaims, however, that it was a buyer's agent, as found by the Commission. It insists it was an agent for the sellers. While it may be that the Commission has unduly stressed the importance of the operations by Red and White during the period it was conducting a lawful business, we think under the circumstances surrounding the organization of Modern Marketing such testimony was material and throws considerable light upon its activities.

We find it unnecessary to relate in detail the voluminous testimony concerning Red and White prior to the enactment of the provision in question. We have considered it and think there is no doubt but that it was not only buyer controlled but that it was a purchasing agent for the buyers as found by the Commission. Red and White was organized by a group of wholesale grocers on December 27, 1927, under the laws of the State of New York. Its capital stock was owned in its entirety by wholesale grocers. It acquired through a license agreement with its principal incorporator, Mr. S. M. Flickinger, certain brands herein referred to as Red and White brands. On June 18, 1932, it created a corporation under the name of Kitchen Products, Inc., which was a wholly owned subsidiary of Red and White and a holding company for certain Red and White brands and trademarks. Flickinger, president of Red and White, was also president of the buyer petitioner, S. M. Flickinger Co., Inc. He continued as president of both companies until his death in 1939.

The stockholders of Red and White, situated throughout the United States, were engaged in the sale and distribution of groceries and allied products under Red and White brands. Each stockholder was required to promote the sale of Red and White branded products to the consuming public through Red and White retail food stores associated with it.

At the beginning of its organization, the following resolution was adopted by its stockholders:

"That this company enter into a grocery products brokerage business, (a) obtaining from its stockholders and others orders for products bearing the Red and White Servus, and other approved brands, and, (b) distributing orders for grocery products so solicited among approved manufacturers, canners, packers, and wholesalers, who will ship the goods to customers, make collection, and pay to this corporation a suitable brokerage fee for its services."

The language "distributing orders * * * so solicited among approval manufacturers" discloses that Red and White at its very inception was intended to represent its stockholders in the purchase of products rather than the manufacturer in their sale. If there be any doubt, however, as to the situation which was intended and which as a matter of fact existed, it is dispelled by the contracts entered into between Red and White and its stockholders. By such contracts, the stockholders were granted authority to sell products packaged under Red and White brands in their respective operative territories. Each stockholder was allowed the exclusive right to sell in a designated territory, as well as the exclusive right to sell Red and White branded products, to Red and White retail affiliated outlets in the franchise territory. The stockholders were allowed to purchase "seasonable" canned goods such as fruits and veg-

etables at a saving in price as compared with prices quoted by Red and White. On items so purchased, Red and White agreed to supply the jobber with labels at cost plus a reasonable handling charge. Such items, however, were required to be submitted to Red and White for approval as to quality.

Certain provisions of these contracts are of particular significance. They provide: "* * * the Jobber agrees that such Red and White Brand * * * products shall be purchased by said Jobber or its successors, only from or through the Corporation and subject to the conditions herein set forth; on which purchases the Corporation shall have the right to receive and collect from the manufacturer, packer, canner or shipper a reasonable brokerage commission. * * * The Jobber agrees to buy from or through the said Corporation, Red & White Brand * * * products * * * a total of not less than One Hundred Twenty-five Thousand Dollars ($125,000.00) during the first year from the date of this contract and not less than One Hundred Twenty-five Thousand Dollars ($125,-000.00) * * * worth during * * * each succeeding year."

These contracts are for a term of four years and thereafter are automatically renewed "provided the Jobber shall have purchased through the Corporation merchandise under the Red & White Brand * * * during the preceding year, a total of not less than One Hundred Twenty-five Thousand Dollars ($125.000.00)." Thus, the effect of these contracts was to authorize Red and White to purchase on behalf of the buyers a minimum amount of products and to collect from the manufacturer a commission thereon.

Red and White also made contracts with the sellers, in which it was agreed that the seller "is to offer through the Corporation (Red and White) the following commodities bearing the brand or brands of the Corporation and that he will confine the sale of such brands exclusively to Red & White wholesale supply houses." Red and White was given the right to approve the quality of the merchandise, and the manufacturer agreed that the price to Red and White supply houses would be no higher than "merchandise of equal quality to other buyer or buyers, however brokerage paid to the Corporation shall not be considered as part of the price." The manufacturer also agreed "to send copies of all invoices covering shipments to Red & White supply houses, immediately after shipment is made, to Red & White Corporation, Chicago, and to the branch office from which order was received or into whose territory shipment was made."

Usually the orders were placed with sellers by Red and White for its stockholders. On some occasions, however, the orders were sent to the sellers directly by the stockholders. In either instance, brokerage on the sale was paid to Red and White. In some cases the stockholder, when submitting its orders to Red and White, would specify the seller to whom the order was to be submitted. In numerous cases, however, the name of the seller was omitted from the order and in such instances Red and White determined who the seller should be. Red and White stockholders handled products under brands other than Red and White. Orders for such products were placed with the seller's own salesman.

Red and White maintained a merchandising, advertising and a store development service. Under its merchandising service, it distributed to its stockholders price lists of commodities manufactured by sellers with whom it had working arrangements. Personal calls were made by various employees of Red and White upon stockholders to promote the sale of Red and White branded stock through such stockholders. The advertising service was inaugurated in 1933, and consisted of numerous publications prepared by Red and White for distribution to the Red and White retail stores. The stockholders were charged for this advertising matter and they in turn were reimbursed by Red and White retail stores. Later, each stockholder was allocated a certain amount for advertising within its territory and the Red and White retail stores were reimbursed from such allocation the money expended for advertising. The record discloses the amount of commissions which Red and White received from sellers on account of purchases by its stockholders for different years. For the fiscal year ending November 30, 1936, Red and White collected from sellers the sum of $340,092.94 as fees and commissions upon the purchases of Red and White stockholders. This exact amount was paid to such stockholders as advertising allowances to promote the sale of Red and White branded products through such stockholders. Thus it is plain that such stockholders received the entire benefit of the bro-

kerage collected from the sellers by Red and White.

The store development committee, sometimes referred to as the field service committee, was organized by Red and White to promote the affiliation of retail outlets with the stockholders. In this connection, a field man was employed whose duty it was to promote the Red and White brand of products to the retail outlets. Conventions were held annually, in each of the six regions into which the United States was divided, for the stockholders and their retail affiliated Red and White food stores. The purpose of the conventions was to build up the enthusiasm of Red and White stockholders and their retail food stores for Red and White branded products. At such conventions "pep" speeches were made and educational matter presented for the purpose of promoting the sale of Red and White branded products through the retail stores. Suggestive bulletins were distributed to the stockholders and by them to the retail stores regarding supervision and management of such stores. These field activities were financed by Red and White. This feature of Red and White's business has been continued by it since the organization of Modern Marketing.

This brings us to a consideration of the status occupied by Modern Marketing. As already shown, its organization followed shortly after the enactment of the Robinson-Patman Act. In fact, it was the direct result of such enactment and was for the purpose either of compliance, as contended by petitioners, or of evasion, as claimed by the Commission. We need not decide or even express any opinion as to the motive which activated its organization. The mere circumstance of its organization is not inconsistent with petitioners' contention that it was for the purpose of compliance. Regardless of the motive, however, the question remains as to whether its activities violated the provision.

All of the stock of Modern Marketing was purchased by former employees of Red and White, and a majority of its shares were purchased by Mr. Asa Strause who held the position of secretary-treasurer and general manager of Red and White. Another stockholder, formerly a "merchandise man" for Red and White, became secretary and divisional manager for Modern Marketing. Another, formerly advertising manager of Red and White, was elected vice president of Modern Marketing, where he performs practically the same duties as he performed with Red and White. Another stockholder, formerly employed by Red and White as manager of its San Francisco branch, performs practically the same function for Modern Marketing, and another, formerly employed as branch officer of the Buffalo office of Red and White, was employed at the same office as branch officer for Modern Marketing. All of Red and White's twenty-four employees in the Chicago office except four were employed by Modern Marketing. Numerous other Red and White employees at different branch offices were employed by Modern Marketing. The office furniture and equipment owned by Red and White at its Chicago as well as several of its branch offices was purchased by Modern Marketing.

Shortly after, it became evident that Red and White could not lawfully operate as it had. Conferences took place between Strause, secretary and general manager of Red and White, and Flickinger, president of Red and White, relative to the formation of Modern Marketing. It was proposed by Strause that Modern Marketing become the licensee of Red and White brands. A plan was finally agreed upon, approved by the board of directors of Red and White, which resulted in a license agreement, executed October 14, 1936, between Red and White as Licensor and Modern Marketing as Licensee.

This agreement among other things in an introductory clause recites:

"Whereas, said ownership and control of said brands, * * * are subject to various existing contracts between the Licensor and its stockholders and/or others."

It then provides:

"The Licensee for the period of one year from the date hereof shall have the exclusive right, privilege and authority throughout the United States to use and deal in, with jobbers or wholesalers, the brands, * * * and to sublicense manufacturers to pack, ship and sell to jobbers or wholesalers goods and merchandise bearing said brands, * * * subject, however, to any and all existing contracts between the Licensor and its stockholders and/or other relative to said brands * * *."

If we understand the meaning of this provision, and we think we do, Modern Marketing merely stepped into the shoes formerly occupied by Red and White and assumed all contractual obligations existing

between Red and White and its stockholders. Red and White, as heretofore pointed out, by contract with its stockholders received its authority to collect brokerage from the sellers, and it also obligated its stockholders by the same contract to purchase from it a minimum amount of Red and White products annually or run the risk of forfeiting their franchise. The license agreement between Red and White and Modern Marketing having been made subject "to any and all existing contracts between" Red and White and the stockholders, it appears reasonable to conclude that Modern Marketing received its authority from the stockholders of Red and White to collect brokerage from the sellers. By the same token, the stockholders of Red and White were obligated to purchase from Modern Marketing a minimum amount of Red and White products annually, and in the case of failure to do so would forfeit their contract with Red and White. This relation alone assumed by Modern Marketing relative to the stockholders of Red and White furnishes strong support for the Commission's finding that Modern Marketing is controlled by Red and White and the buyers and that it in fact acts on their behalf.

There are many other relevant circumstances which point in the same direction and which are inconsistent with petitioners' contention that Modern Marketing was a bona fide brokerage agent of the sellers. Under the license agreement, Modern Marketing was prohibited by Red and White from licensing any other person or firm to use or deal in the brands. It was granted the right of allowing sellers to pack goods under Red and White brands, but such sellers could only sell such products through Modern Marketing. It was provided that Modern Marketing was to furnish labels to the Red and White stockholders at cost plus a handling charge of 15%, and that the goods purchased under Red and White brands should be of a grade and quality approved by Red and White Corporation. The mere fact that Red and White retained the right to pass judgment upon the quality of the goods which the sellers distributed through Modern Marketing is indicative of control by Red and White.

Another indication of control lies in the fact that Modern Marketing was precluded from sublicensing anyone to deal in Red and White branded products. In this connection, it is also pertinent to note that Red and White brands are owned and controlled by Red and White and its stockholders. Without the use of these brands, Modern Marketing could not exist. The record shows that at least 70% of the total business done by Modern Marketing was under Red and White brands. Some 30% of its business was under manufacturers' and jobbers' brands, but it is reasonable to believe, as pointed out by the Commission, that even this business was acquired largely, if not entirely from Modern Marketing's right to use the Red and White brands. In addition to the licensing agreement between Modern Marketing and Red and White, agreements were entered into between Modern Marketing and the stockholders of Red and White for the advertising of Red and White branded products. Modern Marketing agreed with the Red and White stockholders to allocate money to such stockholders for the promotion and sale of Red and White branded products only.

A further circumstance relied on by the Commission as evidencing control by Red and White resides in the terms of the license agreement between Red and White and Modern Marketing, by which the license was to extend for the period of one year from October 1, 1936, subject to renewal for successive yearly periods upon terms and conditions to be agreed upon mutually "unless either party shall before September 1 of any year, give written notice to the President of the other party of its intention to terminate the license at the end of such yearly period." Under this provision, Red and White had a right to cancel the license agreement at the close of any year by written notice. It is true that at the end of the first year, the license agreement was renewed for a period of three years from October 1, 1937. While this power of cancellation may not in itself be evidence of control by Red and White, yet it carries with it the power to enforce control which we think has otherwise been established.

As heretofore pointed out, Nash-Finch, a buyer-defendant, admitted by its answer that it placed orders for its requirements of Red and White products through Modern Marketing. True, it denied that the latter was its agent, but its admission clearly implies that Modern Marketing was acting for it and is inconsistent with the theory that Modern Marketing was a salesman of the sellers.

Sec. 2 (c) makes it unlawful to pay brokerage "to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact or in behalf, or is subject to the direct or indirect control, of any party to such transaction." We are of the view that the proof firmly supports the Commission's conclusion that Modern Marketing comes within the meaning and purpose of this language, notwithstanding the fact that certain testimony offered by the petitioners might reasonably lead to a contrary result. We also are of the view that the proof sustains the finding that it was the agent or representative of Red and White and the buyers, and certainly that it was an intermediary under their "direct or indirect control."

Looking at the realities of the situation in contrast to mere form, it is evident that the only change of any consequence effected by the organization of Modern Marketing and its licensing agreement with Red and White was to change the ownership of the buyers' agent. None of the stock of Modern Marketing was owned by Red and White or the buyers; it was a separate entity whose stock was owned by parties other than buyers. This fact, while a circumstance to be considered, does not disprove that Modern Marketing was controlled by the buyers or that it was an intermediary subject to their direct or indirect control. As was said by the court in the Biddle case, supra, 96 F.2d at page 690:

"While the Biddle Company was disassociated in ownership and management from either buyers or sellers, direct and indirect control can be exercised by buyers or sellers over a broker in transactions of purchase and sale by means other than participation in the broker's ownership and management."

In view of what we have said, the voluminous testimony offered by petitioners, upon which their argument is largely predicated, is of little consequence and certainly not determinative. It is true that Modern Marketing subsequent to its organization entered into brokerage contracts with the sellers and received commissions for services rendered. We assume, in fact we think the proof shows, that such services were genuine and of benefit to such sellers. This is not disputed by the Commission, in fact it is conceded, but it is claimed that such services were incidental to the main activities of Modern Marketing

which were performed on behalf of Red and White and the buyers. Sec. 2 (c) has been construed in numerous cases as prohibiting the payment of brokerage commission under such circumstances. The court in Oliver Bros, Inc., et al., v. Federal Trade Commission, supra, 102 F.2d 763, 770, said:

"While such services resulting in sales by the sellers and obviating, no doubt, the adoption of other sales defenses, are of undoubted benefit to them, this benefit is incidental and is an entirely different thing from the rendering of services by an agent responsible to the seller as principal."

In Great Atlantic & Pacific Tea Co. v. Federal Trade Commission, supra, 106 F.2d 667, 674, the court stated:

"The phrase 'except for services rendered' is employed by Congress to indicate that if there be compensation to an agent it must be for bona fide brokerage, viz., for actual services rendered to his principal by the agent. The agent cannot serve two masters simultaneously rendering services in an arm's length transaction to both. While the phrase, 'for services rendered', does not prohibit payment by the seller to his broker for bona fide brokerage services, it requires that such service be rendered by the broker to the person who has engaged him. In short, a buying and selling service cannot be combined in one person."

Sec. 2 (c) has been similarly construed in Quality Bakers of America v. Federal Trade Commission, 1 Cir., 114 F.2d 393, 399, and in Webb-Crawford Co., et al. v. Federal Trade Commission, 5 Cir., 109 F.2d 268, 270. We agree with the construction that Sec. 2 (c) prohibits the payment for services rendered by a broker who is related to the opposite party in any of the ways designated in the provision. Furthermore, we are of the view that where such relationship exists it is immaterial whether the services rendered the seller were genuine or fictitious and whether they were incidental or otherwise. Even good faith on the part of both the broker and the seller cannot be utilized to escape the condemnation of the provision.

We also think that the proof supports the Commission's findings to the effect that brokerage fees collected by Modern Marketing from the sellers upon purchases made on behalf of the buyers were distributed to and accepted by such buyers and Red and White. True, the distribution was not direct as it was in some of the

cases to which we have referred. The fact, however, that it was more subtle does not change its purpose or effect. For the year from December 1, 1936 to December 1, 1937, Modern Marketing had a brokerage income of $320,658.56, received from its sellers upon purchases by stockholders of Red and White, and of this income it paid to such stockholders $135,712.85 as advertising allowances for point-of-sale advertising. It does not seem unreasonable, as argued by petitioners, that money thus expended for advertising increased the consumer demand for Red and White products and therefore was of benefit to the manufacturer as the seller of such products. On the other hand, it must be conceded that such advertising was for the benefit of Red and White stockholders and buyers, in fact we think it was for their primary benefit, and that such allowance for advertising must be treated the same as though it had been paid to such buyers without any restriction as to the manner of its use.

Red and White received directly from Modern Marketing $30,000 per annum by reason of the license agreement between it and Modern Marketing for the use by the latter of the labels owned by Red and White. Modern Marketing did not keep its brokerage income separate from its other income. Petitioners argue that there is no proof but that this license fee was paid from income of Modern Marketing other than its brokerage fees. This conceivably could be the fact, but we think it is also true, as pointed out by the Commission, that all of Modern Marketing's income was the result directly or indirectly of the license agreement and its right to use the labels of Red and White. Without such use it could not have existed. The great value and worth of the labels owned by Red and White is emphasized by petitioners. The value and worth of such labels after their use had been licensed to Modern Marketing could only be maintained through the activities of the latter. This result was achieved by the allocation of money to the stockholders of Red and White and by other services rendered by Modern Marketing. We think it cannot be logically contended but that Red and White received a direct benefit from the commissions collected by Modern Marketing from the sellers. Moreover, the buyers were stockholders of Red and White and the allowances received by them from Modern Marketing on account of their purchase of Red and White products inured, even though indirectly, to Red and White itself. There is no point in further relating or discussing numerous other circumstances relied upon by the Commission in support of its finding that Red and White and the buyers accepted brokerage fees from Modern Marketing which had been received by it from the sellers.

Red and White and the buyers, as well as Modern Marketing and the sellers, have filed separate petitions for leave to adduce additional testimony. All of such testimony was offered at the hearing before the Examiner and its admission denied. We see no occasion to set forth or discuss it. We have examined the record and are satisfied that in the main such evidence is not material to the issues involved. Especially is this so in view of the determination which we have made of such issues. We might add that in our opinion the rulings of the Examiner on the admission of evidence were as free from error as could reasonably be expected considering the length of the hearing and the volume of testimony which was offered. The petitions are denied.

Modern Marketing contends that even if the order is not set aside it should be modified. We do not agree. A reading of the order discloses, so we think, that it is predicated upon the findings of the Commission which we have approved.[1] It may be, as argued, that the order will work a hardship upon Modern Marketing. If so, that is the fault of the congressional enactment and not the Commission's order. The harshness of the order, if such is the case,

[1] The order directs:

"1. That the buyers cease and desist from accepting from sellers any brokerage fee or commission, or discount or allowance in lieu thereof; and from accepting from Red & White or Modern Marketing, any brokerage fee received by the two corporations from such sellers, either in the form of money or credits, or in services or benefits provided by the two corporations through the use or expenditure of any such brokerage.

"2. That the sellers cease and desist from paying to any such purchasers, or to Modern Marketing, or Red & White, anything of value as brokerage or other compensation.

"3. That Modern Marketing cease and desist from receiving brokerage fees from the sellers; and from transmitting such fees to the purchasers or to Red & White, either in the form of money or

constitutes no legal reason for its nonenforcement.

The petitions and each of them to set aside and vacate the Commission's order are denied. The cross-petition by the Federal Trade Commission for enforcement of its order is allowed. A decree will be entered accordingly.

credits, or in services or benefits furnished by it through the use or expenditure of such fees.

"4. That Red & White cease and desist from accepting from the sellers, or from Modern Marketing, any brokerage fee; and from transmitting any brokerage fee to such purchasers, either in the form of money or credits, or in the form of services or benefits provided by it through the expenditure of any such brokerage fees."