CENTRAL RETAILER–OWNED GRO-CERS, INC., et al., Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 13820.

United States Court of Appeals Seventh Circuit.

July 2, 1963.

Fred H. Law, Jr., Chicago, Ill., Andrew W. Gatenbey and Litsinger, Gatenbey & Spuller, Chicago, Ill., for petitioners.

J. B. Truly, Asst. Gen. Counsel, Miles J. Brown, Atty., Federal Trade Commission, Washington, D. C., James McI. Henderson, Gen. Counsel, for respondent.

Before SCHNACKENBERG, KNOCH and SWYGERT, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Petitioners, Central Retailer-Owned Grocers, et al.[1] which are all corporations, have asked us to review a cease and desist order issued by the Federal Trade Commission on May 14, 1962, upon a complaint charging them with engaging in practices in violation of § 2(c) commonly known as the brokerage section, of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C.A. § 13(c), which provides:

"(c) It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

While Central Retailer-Owned Grocers, Inc., has been referred to as "CROG", we shall refer to it as "Central". The pronunciation of "CROG" is undetermined. We do not believe that the rights of any of the parties will suffer if we use the word "Central" as a reference.

"Central" will be used as also including 29 corporations, who are members thereof and may sometimes also be referred to as "members". There were 35 members named in the complaint and the order, but only 29 joined in the petition for review.

The theory of the complaint, according to the Commission's counsel, is that Central, wholly owned by its members,

1. Allied Grocers of Indiana, Inc., a corporation, Associated Grocers Co., Inc., a corporation, Associated Grocers, Inc., (Wis.), a corporation, Associated Grocers, Inc. (Mo.) a corporation, Associated Grocers, Inc., (Kans.), a corporation, Associated Grocers of Colorado, Inc., a corporation, Associated Grocers Coop., Inc., a corporation, Associated Grocers of Oklahoma, Inc., a corporation, Associated Grocers of Port Arthur, Inc., a corporation, Associated Wholesale Grocers Co., Inc., a corporation Associated Grocers Wholesale Co., a Corporation, Associated Wholesale Grocers of Dallas, Inc., a corporation, Bibb Grocery Co., Inc., a corporation, Dixie Saving Stores, Inc., a corporation, Grand Rapids Wholesale Grocery Co., a corporation, Grocers Whole Coop., Inc., a corporation, Lake Erie Coop. Grocers Company, a corporation, Miami Retail Grocers, Inc., a corporation, Muskegon Wholesale Company Coop., a corporation, Panhandle Associated Grocers, Inc., a corporation, Progressive Associated Grocers, Inc., a corporation, Redman Bros. of Lansing, Inc., a corporation, South Plain Associated Grocers, Inc., a corporation, The Tusco Grocers, Inc., a corporation, United A–G Stores Coop., Inc., a corporation, United Grocers Coop. Assn., a corporation, Weona Food Stores, Inc., a corporation, White Villa Grocers, Inc., a corporation, and Central Florida Cooperative, Inc., a corporation.

By its final order the Commission dismissed the complaint as to National Retailer-Owned Grocers, Inc., which was also named as a respondent before the Commission.

a group of retailer-owned wholesale grocers, in connection with the purchase of private brand food and grocery products from various suppliers on behalf of its members, received and accepted from its suppliers sums of money which it distributed to its members in the form of patronage dividends, and further, that the members placed their orders for private name brands of food and grocery products through Central, shipments thereof being made directly from the suppliers to the members and payment being made by Central to the sellers, with Central reinvoicing its members for the merchandise shipped. Further, the theory is that Central, in connection with such purchases, performed services commonly rendered by independently-owned brokers, which it replaced in a large number of purchase and sale transactions. Accordingly, the Commission's complaint took the position that the sums Central received and accepted from certain of its suppliers constituted brokerage or allowances and discounts in lieu of brokerage, in violation of said § 2(c).

In their answer the members denied that Central purchased food and grocery products in their behalf. Central's answer stated that it was the purchaser of these products, in its own name.

Various hearings were held before an examiner, in which the testimony of the officials of suppliers who had sold merchandise to Central, and several other witnesses, as well as many documentary exhibits, was received in evidence.

The examiner filed an initial decision, finding that respondents (petitioners here) violated § 2(c) aforesaid, and entered a cease and desist order.

The Commission in its final order modified the initial decision and the order therein contained and thereupon adopted it as its own. It filed an opinion, from which Commissioner Elman dissented.

1. The evidence shows that Central is engaged in the business of buying, selling and promoting its own brands of food products and other products that are sold in retail grocery stores, that it receives orders from its members for various products, that it invoices its members for such orders at a price higher than its cost, and that, after paying operating costs, anything that it left is distributed as patronage dividends to the members of Central in accordance with the amount of business done by them with Central during the year. Each member contributes to a deposit with Central to enable it to finance its operation.

The evidence also shows that the members, also referred to in the evidence as "member warehouses", own Central and are themselves in turn owned by retail grocers located in their respective areas, and also that approximately 10% of the purchases of merchandise made by the members of Central consists of controlled label merchandise [2] purchased from Central, with the remaining approximately 90% being purchased from other sources, and also that all of the merchandise handled by Central is packed under controlled labels such as Shurfine and Elmdale.

Central concedes that the evidence shows that in certain instances it has been granted price reductions, discounts and allowances by certain of its suppliers in connection with merchandise purchased by it from said suppliers. Counsel for Central points out, however, that both of the officials of Central who testified at the hearings, Mr. Garbers and Mr. Stolte, and also the officials of all the suppliers of Central who testified, stated that said price reductions, discounts and allowances were not granted to Central as brokerage commissions or as discounts or allowances in lieu of brokerage, and they also stated that the matter of brokerage was not discussed in any of the negotiations between Central and said suppliers.

---

2. In the record we find some confusion occurs because of the use of the words "private label merchandise", "controlled label merchandise", "private brand merchandise" and "controlled brand merchandise". In the context of this opinion, we find no significant difference in meaning.

The Commission points out that all of the capital stock of Central is owned by its members and each of its directors, except one, is a manager of a member-wholesaler. The only director not associated with a member warehouse is Harold Garbers, Central's general manager. The board of directors is empowered by the bylaws to exercise all the powers of the corporation.

It quotes from Central's articles of incorporation:

" * * * the purpose of this organization shall be: to provide a purchasing organization for the member retail grocers and to effect such savings by bulk purchasing and distribute such savings to the member retail grocers, on a patronage percentage basis of purchases."

Central handles approximately 2000 different items usually found in retail grocery stores, purchasing them from approximately 400 different suppliers. Almost all of these products carry petitioners' private labels. Central distributes only to its member-owners.

At the beginning of the season the members submit to Central estimates of how much "private label" merchandise they will probably need during the ensuing year. These advance estimates are prepared on forms distributed by Central to its members. In anticipation of this estimated volume of private label business, Central contacts suppliers of various products to obtain the necessary quantities. All negotiations take place in Central's office in Chicago and are conducted orally. When a price is agreed upon which is less than the supplier's list price, Central enters into understandings with the supplier covering the anticipated needs of the members.

After these arrangements are completed, and at such times as the members require quantities of the private label merchandise, they submit orders to Central. Central then, in each instance, prepares a combination confirmation-order form, sending a copy of the order to the supplier of the particular product ordered and the confirmation to the ordering member. The confirmation form contains the name of the supplier and the price to be paid by the member to Central, which includes a markup which goes to pay operating costs, and the balance constitutes the fund from which so-called patronage dividends are paid. Upon receipt of the order, the designated supplier ships the product ordered directly to the member and bills Central. Central pays the supplier and in turn looks to the member for payment.

Thus, at the end of each operating year, Central distributes to its members in the form of patronage dividends, based upon the members' purchases, all funds accumulated less operating expenses.

In negotiating with its prospective suppliers, Central points to the unique way in which it does business. Its buyer, Stolte, testified that petitioners' "unique" way of doing business was reflected in the fact that they "buy merchandise and really sell it to ourselves". Suppliers are informed that they will realize savings from Central's advance commitments from its members, the lack of credit risk, the fact that the suppliers need look to only one central office for payment instead of to various offices of its members, and the fact that Central supplies its own labels. But Commission counsel says that Central "receives *certain sums of money* from its suppliers in the form of 'promotional allowances', 'service allowances', 'discounts' or lower net prices." [3]

Most of these suppliers also sell their products under their own "packer label".

3. This is the exact language of counsel's charge in its main trust against Central. For emphasis we have italicized the words "certain sums of money". This is an invidious charge, and for that reason, we have carefully examined every one of the 20 references to the record cited by counsel in their effort to support the above statement. As a result, we find no such support. 19 of the instances referred to amount to merely the allowance of discounts in price. The 20th incident refers to a similar allowance made in a monthly lump sum.

In such circumstances they generally employ the services of a broker and pay a brokerage commission on the business obtained by the broker. Where these suppliers sell their packer label products directly to Central members, they pay brokerage commissions to the broker through whom the order is placed. With the dubious exception of two ambiguous instances, no brokers received any commission on sales of private brand merchandise to Central.

The Commission argues that, in most instances, the amount of the price concessions, discounts or allowances afforded Central by its suppliers may be correlated mathematically with the normal rates of brokerage which the suppliers pay their brokers on regular sales.

Not only from the evidence of the massive manner in which Central and its members were able to acquire their merchandise, but also by the specific testimony of many individual representatives of various suppliers, it was established that lower prices were obtained from suppliers by Central because of the advantages to the suppliers resulting from the cooperative buying efforts of the members through Central. For instance, Robert Gordon, of W. O. Sommers, Inc., testified that in determining the prices which he charged Central, he took into consideration the fact that Central gives Sommers a yearly contract which is unusual in the business of said supplier, that Central is the only one that gives Sommers a yearly contract to buy a certain quantity of merchandise from Sommers, that said fact helps tremendously in Sommers' purchasing of raw materials, and that Central promotes maraschino cherries by putting on "specials". Gordon said:

" * * * the only reason I gave them a better price is the fact that they, as I stated before, * * * took a certain amount of the speculation out of our business. They give us a contract at the beginning of our brining year, before our brining year starts, and before we go out and contract for merchandise on the West Coast. And we can depend upon so many cases approximately so many cases, of merchandise from CROG [Central], depending upon business. It might be five hundred cases or so, over or under that period—that amount—but at least we know that we have eight per cent as far as our bottled goods is concerned and our Northwest fruit is concerned, they represent over ten per cent of our business."

2. It is apparent to us that an inference of the Commission to the effect that Central received commissions, brokerage, or other compensation, or allowances or discounts in lieu thereof, from its suppliers, was improperly drawn from comparisons of brokerage paid by such suppliers on sales which they made through brokers, with the price reductions granted to Central. The inference upon which the Commission's finding and order are based has no substantial evidence in the record to support it. Instead, the record convincingly shows that the payments made by Central to its suppliers were for merchandise which it bought upon its own credit and not on orders of its members transmitted by it to the suppliers. The fact that Central, because of its strong purchasing power, was able to buy at favorable prices, or on discounts and allowances by its suppliers, is not proof that Central was rendering a broker service. It bought on its own order and on its own credit. It was billed by the suppliers and it paid the bills. A broker does not purchase for his own account, is not billed by the seller, and does not make payment to the seller. Central was able to secure favorable prices from its suppliers, because of (1) their assured volume of business, (2) their lack of any credit risk, (3) a reduction in their billing work, and (4) Central's advance commitments for later requirements. The result was that the suppliers knew that, in selling to Central, they were for these reasons realizing savings in their business operations, which enabled Central's members, in turn to benefit when they purchased from

Central. Reason does not permit our ignoring these facts in order to declare illegal a worthy effort by a number of wholesale grocers, owned by retailers, to reduce the ultimate sale prices to the consumer, by entering into the arrangement with Central, which made them stronger in their competition with large chain stores.

The examiner in this case seemed myopic. On October 9, 1961, he stated that he was

" * * * unable to envision any type of buyer organization which could rightfully claim that by reason of its different or unique character, it can receive special discounts and allowances from any seller in complete immunity and exemption from the clear mandate of the statute."

Chairman Paul Rand Dixon of the Commission stated in a speech before the Economic Club of Detroit on March 12, 1962:[4]

" [C]ombination in one form or another by small firms may be essential to their survival, particularly in those industries characterized by massive aggregates of corporate power. The growth of the giant food chains, for example, revolutionized the behavior of the small independent grocery stores. They were quickly faced with the alternative of constructing cooperative buying arrangements or extermination. Certainly many independent food stores long ago would have withered before the competitive threat of large chains had they not formed retailer-owned cooperative wholesalers; stores with combined retail sales of over $7 billion are now affiliated with such jointly-owned wholesalers."

In the case at bar the Commission would drive such groups out of existence.

We think that the chairman was right when he made the above statement, rather than when he joined in the order being reviewed in this case, which was entered on May 14, 1962.

The substantial evidence in the record, considered as a whole, lends no support to the inference drawn by the Commission to the effect that Central received or accepted price concessions "in lieu of brokerage". It is obvious that, without any facts to support this inference, counsel for the Commission made a mathematical comparison between brokerage, if it had been paid by suppliers on sales through brokers, and the savings accomplished by Central for its members, in its direct dealings with the suppliers. While we see no significant similarity between the percentages thus obtained and tabulated in the Commission's brief, we realize the difficulty under which Commission counsel labor in attempting to construct a case against petitioners. However, we doubt whether this synthetic method of proving a violation of § 2(c) is warranted, in the face of abundant, concrete evidence in the record showing that this proceeding is directed against an inherently legitimate enterprise.

There were no savings in brokerage expenses involved in this case and hence the following principle, announced in Federal Trade Commission v. Henry Broch & Co., 363 U.S. 166, 176, 80 S.Ct. 1158, 4 L.Ed.2d 1124, does not apply here:

" * * * A price reduction based upon alleged savings in brokerage expenses is an 'allowance in lieu of brokerage' when given only to favored customers. * * *"[5]

---

4. According to the dissenting opinion of Commissioner Elman.

5. We have carefully examined Modern Marketing Service v. Federal Trade Commission, 7 Cir., 149 F.2d 970 (1945), and Independent Grocers Alliance Dist. Co. v.

Federal Trade Commission, 7 Cir., 203 F. 2d 941 (1953), relied on by the Commission. We recognized in those cases from undisputed evidence that brokerage fees were involved. These cases are not apposite here.

For these reasons, the order of the Commission issued on May 14, 1962, is set aside, except as to its dismissal of National Retailer-Owned Grocers, Inc., in which respect it is affirmed.

Order set aside, except as indicated.