## SOUTHGATE BROKERAGE CO., Inc., v. FEDERAL TRADE COMMISSION.
### No. 5331.

Circuit Court of Appeals, Fourth Circuit.

July 19, 1945.

Charles L. Kaufman, of Norfolk, Va., and William P. Smith, of Washington, D. C., for petitioner.

Joseph J. Smith, Jr., Asst. Chief Counsel, of Washington, D. C. (W. T. Kelley, Chief Counsel, Federal Trade Commission, of Washington, D. C., on the brief), for respondent.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is a petition by the Southgate Brokerage Company to review and set aside an order of the Federal Trade Commission directing that company to cease and desist from accepting brokerage, or any commission, compensation, allowance or discount in lieu thereof, on purchases made for its own account. The company petitions also that it be allowed to adduce evidence, rejected by the Commission, to the effect that it has rendered services to the sellers in connection with such purchases for which it claims to be entitled to compensation. The Commission has filed a cross petition asking that its order be enforced.

There is no dispute as to the facts. The brokerage company, which has its principal office in Norfolk, Va., does a large commission and brokerage business in Virginia and the Carolinas to which the order of the Commission admittedly has no application. In addition, it does a large business as distributor of products which it buys from processors and subsequently sells to its customers. It is with respect to this business that the order of the Commission applies; and the facts bearing thereon are covered by the fourth and fifth paragraphs of the Commission's findings, which are fully supported by the evidence and are as follows:

"Paragraph four: The purchases made by respondent in its own name and behalf and for its own account constitute approximately sixty per cent of its total volume of business. The merchandise so purchased is stored by respondent in its own warehouses, and is in all respects its own property to deal with as it sees fit. Respondent insures the merchandise in its own name and at its own expense, pays such taxes as may be levied on the merchandise, and resells it to such purchasers and at such prices and upon such terms as its judgment may dictate, reaping a profit or sustaining a loss thereon, as the case may be. If the merchandise is lost or damaged while in transit from the seller to respondent, respondent files claims against the carrier for such loss or damage in its own name and for its own benefit. In short, respondent's title to the merchandise is absolute. Respondent frequently enters into contracts of purchase with packers and canners of food products calling for the future delivery of large quantities of goods to respondent at fixed prices. In such cases, respondent's profit or loss on the transaction usually depends, of course, upon whether the market advances or declines after the contract is executed. Some of the canned food products purchased and resold by respondent bear respondent's own private trade-marks or brands, which are registered in the United States Patent Office. The labels for such goods are supplied by respondent to the packer or canner, who affixes them to the cans or other containers in which the goods are packaged.

"Paragraph five: In connection with the purchase in interstate commerce of such food products and other merchandise in its own behalf and for its own account, respondent in many instances receives and accepts and for a number of years last past has received and accepted from the sellers of such merchandise, brokerage or allowances and discounts, in lieu of brokerage. The brokerage is usually received by respondent in one of two ways. In some cases, the seller remits the amount of the brokerage to respondent by check. In other cases, respondent in remitting to the seller the purchase price of the merchandise deducts the brokerage, or a discount or allowance in lieu thereof, from the seller's invoice. The amount of brokerage thus received and accepted by respondent is substantial. For example, the amount received on purchases made by respondent between July 1, 1941, and December 31, 1941, was $25,873.68."

The evidence which the Commission excluded as irrelevant, and which the company asks that it be allowed to produce, is evidence of various witnesses to the effect that, in connection with the goods purchased and sold as distributor and covered

by the foregoing findings of fact, it renders services consisting of "promoting, offering for sale, selling, ordering, receiving, adjusting shortage or damage claims, handling, warehousing, distributing, invoicing, collecting, assumption of credit risks". We entertain no doubt that the evidence was properly excluded and that on the undisputed facts the cease and desist order was properly entered.

Section 2(c) of the Robinson-Patman Act, 15 U.S.C.A. § 13(c), is as follows: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

■ It is perfectly clear that this· provision forbids the payment of brokerage on a sale or purchase of goods to the other party to the transaction. The seller may not pay the buyer brokerage on the latter's purchases for his own account. As said in the Report of the House and Senate Conference Committee with reference to this subsection (House Rep. 2951, 74th Cong. 2nd Sess.): "This subsection permits the payment of compensation by a seller to his broker or agent for services actually rendered in his behalf; likewise by a buyer to his broker or agent for services in connection with the purchase of goods actually rendered in his behalf; but it prohibits the direct or indirect payment of brokerage except for such services rendered. It prohibits its allowance by the buyer direct to the seller, or by the seller direct to the buyer; and it prohibits its payment by either to an agent or intermediary acting in fact for or in behalf, or subject to the direct or indirect control, of the other."

The section has been so construed in all of the cases in which it has been considered. Biddle Purchasing Co. v. Federal Trade Commission, ·2 Cir., 96 F.2d 687; Oliver Bros. v. Federal Trade Commission, 4 Cir. 102 F.2d 763; Great Atlantic & Pacific Tea Co. v. Federal Trade Commission, 3 Cir. 106 F.2d 667; Webb Crawford Co. v. Federal Trade Commission, 5 Cir. 109 F.2d 268; Quality Bakers of America v. Federal Trade Commission, 1 Cir. 114 F.2d 393; Jarrett v. Pittsburgh Plate Glass Co. 5 Cir. 131 F.2d 674; Fitch v. Kentucky-Tennessee Light & Power Co. 6 Cir. 136 F.2d 12, 149 A.L.R. 650 and note at page 662 et seq. and cases there cited; Modern Marketing v. Federal Trade Com. 7 Cir., 149 F.2d 970. As said in Quality Bakers of America v. Federal Trade Commission, supra, 114 F.2d 393 at page 398: "It is plain enough that the paragraph, taken as a whole, is framed to prohibit the payment of brokerage in any guise by one party to the other or the other's agent, at the same time expressly recognizing and saving the right of either party to pay his own agent for services rendered in connection with the sale or purchase."

It is argued that the section is not applicable here because the receipt by the company of brokerage from the sellers results in no discrimination against buyers, since the company sells only to wholesalers, who pay the prices that they would otherwise pay if the sales were made to them through brokers. It is said that a distributor, such as the company, renders to the wholesale trade the service that a broker ordinarily performs, and that no discrimination is involved in allowing such distributor the ordinary broker's commissions. The answer is that price discrimination, which is covered by section 2(a) of the Act, 15 U.S.C.A. § 13(a), is not necessary to a violation of section 2(c), quoted above, which specifically forbids the payment of brokerage by the seller to the buyer or the 'buyer's agent. We went into this matter very carefully in Oliver Bros. v. Federal Trade Commission, 4 Cir. 102 F.2d 763, 767, where we said:

"The Robinson-Patman Act of June 19, 1936, 49 Stat. 1526, was an amendment of the Clayton Anti-Trust Act of October 15, 1914, 38 Stat. 730. Section 2 of the Clayton Act, which was the section amended, merely forbade discrimination in price when the effect of such discrimination was to substantially lessen competition or tend to create monopoly. The Robinson-Patman Act broadened the scope of this provision, conferred upon the Federal Trade Commission power to establish quantity differentials for the purpose of determining dis-

crimination and cast the burden of proof upon one charged with discrimination to justify any discrimination shown. Receipt of price discrimination was made unlawful for the first time, section 2(f), 15 U.S.C.A. § 13(f); and three specific matters were forbidden as unfair trade practices by subsections (c), (d) and (e), viz.: the granting of commission or brokerage, or any allowance in lieu thereof, to the other party to the transaction or his agent, the making of discriminatory payments by seller to buyer for services rendered by the latter and discrimination by the seller in the rendering of services to the buyer. It is perfectly clear that all three of these practices were forbidden because of their tendency to lessen competition and create monopoly, without regard to their effect in a particular case; and there is no reason to read into the sections forbidding them the limitations contained in section 2(a) having relation to price discrimination, which is an extremely difficult matter to deal with and is condemned as unfair only in those cases where it has an effect in suppressing competition or in tending to create monopoly. The forbidding of specific practices because of their tendency toward a general result, also forbidden, is familiar legislative practice; and no reason suggests itself why the limitations and provisions relating to one should be read into those relating to the other."

We are not impressed with the argument that the company renders services to those from whom it purchases, within the meaning of the exception to subsection (c) quoted above. The services which the company proposes to show by the evidence that was excluded are services rendered to itself, as purchaser, owner and subsequent seller of the goods purchased, and not to those from whom it has purchased them. It is immaterial that those persons are benefited by the fact that the company purchases from them the goods which it subsequently resells. The crucial fact is that all of the services upon which it relies are services rendered in connection with its own purchase, ownership or resale of the goods; and these services it renders, not to those from whom the goods are purchased, but to itself. Directly in point are the cases above cited of Biddle Purchasing Co., Oliver Bros., Great Atlantic & Pacific Tea Co., Webb Crawford Co., Quality Bakers of America, and Modern Marketing. The Great Atlantic & Pacific

Tea Co. case is practically on all fours, involving an allowance of brokerage made directly to the buyer because of alleged services rendered the seller by the buyer's purchasing agents. The other cases cited involved situations where agents of buyers were collecting from sellers brokerage which they were passing on to the buyers whom they represented; but if the statute forbids the payment of brokerage to such agents because they represent buyers, a fortiori it forbids the payment to the buyers themselves; and, if the agents cannot be brought within the exception of the section by reason of services rendered, certainly the buyers cannot because of rendering the same sort of services. In the Oliver case it appeared that the commissions allowed the buyers' agent were received by the buyers; and we commented on this as showing beyond question that the section had been violated in that the buyers were receiving commissions on their purchases. We said:

"We come then to the final question in the case, viz., whether the brokerage commissions here involved come within the exception contained in section 2(c), i.e., are they paid for services rendered to the sellers? A sufficient answer to the question is found in the fact that the commissions are received by the buyers and not by Oliver, and that there can be no contention that any services are rendered by the buyers to justify the payment of compensation to them. * * * They are receiving brokerage commissions on their purchases; and the fact that they may have paid the purchasing agent for services rendered them and that they receive the commissions because of this does not alter the fact that they are receiving the commissions on their purchases.

"And even if it were true that Oliver rendered services to the sellers, we do not think that this would change the situation. No one would contend that, without violating this section, a broker representing the seller could give his commissions to the buyer; for in such case the action of the broker would be the action of his principal, the seller, and would amount to the allowance of commissions by the seller to the other party to the transaction in direct violation of the statutory provision. As we have seen, it constitutes a clear violation of the section for the buyer to receive commissions allowed an agent who represents him alone. If, therefore, the buyer may

not receive commissions allowed either his own agent or the agent of the seller, it would seem to follow necessarily that he may not receive commissions allowed a broker who is the agent of both. We may assume that under the section it is permissible for a broker to render services to both buyer and seller and to receive from both compensation for the services rendered; but this is a very different thing from the buyer himself receiving the compensation."

█ The company argues that the receipt of brokerage on its purchases is authorized by section 2(d) of the Act, 15 U.S.C.A. § 13(d), which provides:

"It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities."

This subsection has no relation to payment of brokerage to buyers or their agents, which is dealt with in the preceding subsection, but is intended to prevent discriminatory payments by seller to buyer on account of services actually rendered the seller. It is commonly referred to as the "advertising allowance" section of the act; and as explained by Representative Utterback in presenting the conference report to the House the words "services or facilities", rather than the term "advertising allowance", were employed for the purpose of making the "prohibitions of the bill * * * intentionally broader * * * in order to prevent evasion." 80 Cong. Rec. 9418. As pointed out above, the services rendered by the company with respect to goods purchased by it are services rendered to itself, and not to the sellers, and consequently can furnish no basis for payment by the sellers. It is little short of absurd to argue that the receipt by a buyer of brokerage on his purchases, forbidden by subsection (c), is validated by subsection (d), the purpose of which is to forbid discriminatory payments for services actually rendered by buyers.

The earnestness of counsel for the company in presenting its cause has led us to discuss its contentions at greater length than their merit seems to warrant. Stripped of verbiage, his position is that in acting as a distributor of the products of the sellers, the company performs for them the service of a broker and is entitled to the compensation of a broker. The fact is, however, that the company is not a broker but a purchaser with respect to the goods that it purchases for its own account. In selling these goods to others it acts, not for those from whom it has purchased them, but for itself. Any profits due to rise in the market belong to it and any losses, whether from decline in the market or other cause, fall upon it. It sells for itself, to whom it pleases and at prices which it determines. The fact that it purchases from the sellers is doubtless beneficial to them and may enable them to dispense with the services of a broker on such transactions; but this does not mean that it has rendered services to them within any fair meaning of that language as used in the statute.

█ For sellers to pay purchasers for purchasing, warehousing or reselling the goods purchased is to pay them for doing their own work, and is a mere gratuity. Cf. Mitchell Coal & Coke Co. v. P. R. R. Co. 230 U.S. 247, 263, 33 S.Ct. 916, 57 L. Ed. 1472; Merchants Warehouse Co. v. United States 283 U.S. 501, 511, 51 S.Ct. 505, 75 L.Ed. 1227. What we said in the Oliver case with regard to a purchasing agent's exacting brokerage which it passed on to the buyer applies with added force where the buyer himself claims to have rendered the service justifying the brokerage. We said: "Because of the buying power possessed by purchasing agents, whether representing chains or independent dealers, sellers may be willing to allow them brokerage commissions * * * earned in the sense that the sellers are thus enabled to sell goods without resorting to other sales devices; but the fact remains that the buyer who receives the brokerage allowed his purchasing agent receives an advantage, and a concealed advantage, which the buyer who purchases directly from the dealer does not receive. It was this sort of discrimination, we think, which it was the purpose of this section of the Act to forbid."

612

For the reasons stated, the petitions to set aside the order of the Commission and to adduce additional evidence will be denied, the prayer of the cross-petition will be allowed and decree will be entered enforcing the Commission's order.

Order enforced.