354 F.2d 182
 EMPIRE RAYON YARN CO., Inc., Plaintiff-Appellant,
v.
AMERICAN VISCOSE CORPORATION, Fred Malina, Arthur Malina,
Edythe M. Charnasand Fred H. Diamond, co-partners
doing business as Malina Company,
GutnerBrothers Corporation,
Defendants-Appellees.
 No. 468, Docket 29554.
 United States Court of Appeals Second Circuit.
 Argued May 4, 1965.
Decided Dec. 13, 1965.
 
 Jacob Greenwald, Sweet, Reinitz, Peskin & Sweet, New York City, for appellant.
 E. Compton Timberlake, New York City (Jackson, Nash, Brophy, Barringer & Brooks, Lawrence P. McGauley, New York City, for American Viscose Corp.; Silver, Bernstein, Seawell & Kaplan, Nahum A. Bernstein, New York City, for Malina Co.; Herbert S. Greenberg, New York City, for Gutner Bros. Corp.), for appellees.
 Before MOORE, SMITH and HAYS, Circuit Judges.
 HAYS, Circuit Judge.
 
 
 1
 The complaint dismissed by the judgment below attacked the validity under the Robinson-Patman Act[1] of defendants' distribution system for rayon yarn. The district court granted summary judgment for the defendants. 238 F.Supp. 556 (S.D.N.Y.1965). We reverse.
 
 
 2
 The plaintiff Empire Rayon Yarn Co., Inc. (Empire) buys unprocessed rayon yarn from the manufacturers of such yarn. Part of this yarn it converts, or processes, for use in the textile trade and part it resells in the original package and condition as received from the manufacturers. In this latter capacity Empire functions as a jobber, buying the rayon yarn on its own account, warehousing it at its expense and reselling it to wholesalers, other converters and retailers.
 
 
 3
 The defendant American Viscose Corporation (American) manufactures and sells unprocessed viscose rayon yarn in interstate commerce under the tradename 'AVISCO.' As of 1958 American manufactured over thirty-five per cent (35%) of the total production in this country of viscose rayon yarn.
 
 
 4
 At issue here is the legality of the method of distribution of this yarn established by American. The affidavit of the general sales manager of American stated the fundamentals of that method:
 
 
 5
 'Many years ago American established a distribution policy for the sale of viscose rayon yarn by direct sales to consumers of most of the product and sales to two jobbers, the defendants Malina and Gutner, of a small percentage of the product. These two jobbers were able to sell and service smaller units of the textile trade at lower selling costs than American and for that reason American established the jobber relation. These jobbers performed such services as the maintenance of substantial inventories of yarn in their plants as well as in warehouses, maintenance of an experienced selling organization, assumption of all risk of loss and credit, advertising American products, assumption of all risk of price fluctuation and furnishing of technical assistance to users of rayon. For acting as such jobbers American allowed a discount from list price on all viscose rayon yarn resold by the jobbers. On all sales to these jobbers for processing (not for resale) they pay the current price just the same as the plaintiff (Empire) or any other customer.'
 
 
 6
 In order to implement this dual distribution system American contracted with the defendant Malina Company (Malina) on May 19, 1949, and with the defendant Gutner Brothers Corporation (Gutner Brothers) on June 2, 1949, to act as American's 'appointed Jobbers.'[2] Malina combines the functions of converter and jobber, whereas Gutner Brothers is only a jobber.
 
 
 7
 The contracts which American signed with Malina and Gutner Brothers are virtually identical. The 'Whereas' clauses state that American 'desires to avail itself of the services of selected Jobbers in selling (viscose rayon) * * * yarn in its original form to bona fide fabric manufacturers who, either because of their inability to produce in bulk or because of their inadequate credit position, are not supplied directly' by American; and that
 
 
 8
 'the Jobber maintains a large inventory of * * * (American's) yarn in its natural form; carries all overhead costs such as rentals, insurance costs, salesmen's commissions, accounting and other general office expenses incident to maintaining its inventory and performing its other functions of creating and maintaining a market, selling and distribution; and assumes both the risks of loss resulting from price fluctuation and the credit risks entailed in the marketing of yarn in its original form * * *.'
 
 
 9
 Malina and Gutner Brothers undertook to function as jobbers which is defined 'to consist of the resale of said yarn in original form to bona fide fabric manufacturers, together with the maintenance at the Jobber's expense of adequate stocks, a warehouse and a sales force.' The contract further stipulates that Malina and Gutner Brothers are not appointed 'the agent or legal representative' of American 'for any purpose whatsoever.' The contract provides that Malina and Gutner Brothers shall resell the yarn at American's published list prices and that yarn shall be resold in Fair Trade states at the list price 'in effect on the date of acceptance of the order from the Jobber's customer,' plus taxes. Section IV of the contracts provides that 'in consideration of the Jobber functions described herein * * * the Jobber shall be allowed a Functional Discount on all graded rayon yarn purchased hereunder and resold by the Jobber in its original form * * * equal to five per cent (5%) of the list price of such yarn at the date of shipment' by American to the Jobber. Section V sets forth certain conditions 'in order to avoid any discrimination against other customers (of American) * * * or against customers of the Jobber through the granting or receiving of said Functional Discount.' It excludes any discount on sales of yarn not resold in the original form or of yarn subsequently processed by the Jobber; sales by the Jobber to customers controlled by the Jobber, its stockholders or employees, unless such resale is bona fide and without price discrimination; sales by the Jobber to other jobbers or to persons other than bona fide fabric manufacturers without American's specific approval; sales of yarn resold and subsequently purchased by the Jobber; and sales of yarn resold by the Jobber in which he retains more than a credit interest. Section VI of the contract requires that the Jobber report monthly on its sales in detail and that he permit American to inspect the Jobber's books and records. The Functional discount is credited by American to the Jobber's account, and adjustments are made yearly.
 
 
 10
 Defendant American sold unprocessed rayon yarn under the terms of this contract to both Malina and Gutner Brothers from 1949 through 1955 in large amounts totalling in value over $17,855,000 and $5,074,000, respectively. To the plaintiff Empire, American sold at list price without discount about $62,000 worth of unprocessed rayon yarn from 1953 through the first nine months of 1959. However, Empire during this same period bought from other manufacturers and resold in the original package unprocessed rayon yarn to a value of over $1,600,000.
 
 
 11
 Empire's president repeatedly asked American for treatment equal to that given Malina and Gutner Brothers and in 1956 American responded by submitting for Empire's approval a contract virtually identical to those accorded Malina and Gutner Brothers; but shortly thereafter American withdrew the offer. American's general sales manager stated that its 'officers * * * in the exercise of their own business judgment decided that the volume of yarn sold by the jobbing trade did not, and does not (as of January 1958) * * *, justify the appointment by American of more than three jobbers.'[3]
 
 
 12
 Empire had made demands in 1953 on two other manufacturers of rayon yarn, American Enka Corporation and E.I. du Pont de Nemours, for similar discounts; American Enka Corporation agreed in May or June 1958 (after Empire's complaint was filed) to grant a five per cent (5%) discount 'for all graded viscose rayon yarn,' but du Pont refused. During 1958 and the first nine months of 1959 Empire received about $32,000 in discounts on its purchase of yarn from American Enka Corporation.
 
 
 13
 Shortly after American's refusal to grant Empire the same discounts provided for American's 'appointed Jobbers,' Empire brought suit against American, Malina, Gutner Brothers and Shawmut, Inc.,[4] claims violations of the Robinson-Patman Act, specifically Sections 2(a) (price-discrimination),[5] 2(c) (false brokerage),[6] 2(d) (discriminatory allowances),[7] and 2(e) (discriminatory services),[8] and seeking treble damages and injunctive relief under Sections 4[9] and 16[10] of the Clayton Act.
 
 
 14
 In 1958 a motion and a cross-motion for summary judgment were made. Both motions were denied by the district court because of the existence of challenged issues of fact. 160 F.Supp. 334 (S.D.N.Y.1958).
 
 
 15
 After additional discovery and abandonment of the 2(a) claim, the present motions and cross-motions for summary judgment were made in 1964.
 
 
 16
 The district court believed that, although the payments made to Malina and Gutner Brothers come within he scope of the statute as 'a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof,' they escaped the statutory prohibition because they were made 'for services rendered in connection with the sale or purchase of goods, wares, or merchandise.'[11]
 
 The court said:
 
 17
 'In the instant case, viewing the jobber defendants as buyer, such services are rendered. They resell at American's list price. Viewed another way, they bring buyer and seller together for a commission and the fact that they take title in the interim does not detract from the value of this service.' 238 F.Supp. 556, 560 (S.D.N.Y.1965).
 
 
 18
 Reselling at American's list price is not a service rendered to American, but merely a condition of the buyer's contract of purchase. If Malina and Gutner Brothers chose to resell at American's list price they became entitled to a discount. Obviously the resale itself was not a service rendered to American. Quite as clearly the price charged for such resale was no more a service rendered than any other condition of the resale, such as the fact that the buyers were entitled to the discount only on unprocessed yarn.
 
 
 19
 There is no evidence whatsoever that Malina and Gutner Brothers brought 'buyer and seller together.' They bought goods from American, kept on hand a stock of these goods, and sold them to the purchasers they found ready to buy. In reselling the goods which they bought from American they were no more acting as brokers than are retailers who buy goods from wholesalers and sell them to consumers. See Western Fruit Growers Sales Co. v. FTC, 322 F.2d 67, 68 (9th Cir. 1963), cert. denied, 376 U.S. 907, 84 S.Ct. 661, 11 L.Ed.2d 606 (1964); Southgate Brokerage Co. v. FTC, 150 F.2d 607, 609 (4th Cir. 1945). The retailers do not bring the wholesalers and the consumers together.
 
 
 20
 The set-up of this industry is quite different from a genuine brokerage. A broker assumes no obligation and runs no risks. Malina and Gutner Brothers purchase the yarn from American. They are required by their contracts with American to maintain 'a large inventory of * * * (American's) yarn.' They must pay for the storage of their inventory until they have found buyers. If the yarn cannot be sold Malina may choose to process it rather than to pay out more for storage. It runs the risk of loss on the processed yarn. Gutner Brothers may find that they are selling yarn at a loss when they have held it for a long period of time, incurring large warehousing charges. If the yarn does not move promptly Malina and Gutner Brothers may have to seek to persuade American to lower the list price or American may do so of its own accord. In either event Malina and Gutner Brothers may suffer a loss on their inventoried yarn. Malina and Gutner Brothers assume the risk involved in extending credit to the firms to which they sell. That this may be considerable is indicated by the fact that 'inadequate credit position' of the firms to which Malina and Gutner Brothers sell is one of the reasons given in the contracts between American and Malina and Gutner Brothers for instituting the method of distribution provided by the contracts. This list of differences between the functions of brokerage and the functions performed by Malina and Gutner Brothers need not be prolonged. It is quite clear that these two firms were not rendering ordinary broker's services to their seller.
 
 
 21
 It is no answer to Empire's complaint to say that American need not deal with Empire if it chooses not to do so. Whether or not this is true as a general proposition, it is quite clear in this case that American is excluding Empire from the market solely by means of a price differential which is effected by means of payments forbidden under Section 2(c). Empire can purchase all the yarn it wants from American and can sell it (except where it is fair-traded), for any price it can get. But in practice Empire cannot sell yarn at a competing price because of the discount granted to th other buyers and refused to Empire. The legislative purpose which led to the enactment of Section 2(c) was the elimination of payments which had that result. 'Congress in its wisdom phrased 2(c) broadly, not only to cover the other methods then in existence but all other means by which brokerage could be used to effect price discrimination.' FTC v. Henry Broch & Co., 363 U.S. 166, 169, 80 S.Ct. 1158, 1161, 4 L.Ed.2d 1124 (1960).
 
 
 22
 If, as we hold, the discounts granted to Malina and Gutner Brothers are not true brokerage because there is no brokerage relationship, objection may be made that the payments, since they are not called brokerage by the parties, do not come within the scope of Section 2(c) at all. But the impact of Section 2(c), as we read it, is on discounts which are granted in connection with sales brought about by the persons who receive the discounts. The prohibition of the statute is not confined to brokerage but extends also to commissions and, indeed, to 'other compensation, or any allowance or discount in lieu thereof.' While the discount here involved is a discount from the price charged to the jobbers, it is payable only if and when they have sold the purchased yarn at a price set by American, and is therefore in an important sense incidental to such sale.
 
 
 23
 Discrimination in price, as such, is governed by Section 2(a). Where the price discrimination is effected by a discount which is related to a sale by the person receiving the discount (i.e. a commission or brokerage or other similar compensation), Section 2(c) is applicable.
 
 
 24
 A 'functional discount' which is paid, like commissions and brokerage, in connection with such a sale, may be used to mask price discrimination in violation of the legislative purpose of Section 2(c).
 
 
 25
 'The 'unqualified' prohibition of Section 2(c), legislatively aimed at brokerage age devices for the concealment of price discriminations, was designed to force these price differentials 'into the open' for measurement and adjudication under the price discrimination provisions.' Rowe, Price Discrimination Under the Robinson-Patman Act 331 (1962), citing FTC v. Simplicity Pattern Co., 360 U.S. 55, 68, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959); Biddle Purchasing Co. v. FTC, 96 F.2d 687, 692 (2d Cir.), cert. denied, 305 U.S. 634, 59 S.Ct. 101, 83 L.Ed. 407 (1938); H.R.Rep. No. 2966, 84th Cong., 2d Sess., 97-98 (1956).
 
 
 26
 Therefore, the payments made to Malina and Gutner Brothers fall within both the language and the legislative intent of Section 2(c). It follows that they are prohibited by that Section.
 
 
 27
 We are cited to no authority supporting defendants' claim that plaintiff's complaint, because of plaintiff's arrangement with American Enka, is barred by the doctrine of unclean hands, and we find none. Plaintiff's authorities support its position that the doctrine is inapplicable in this kind of case. American Co-op. Serum Ass'n v. Anchor Serum Co., 153 F.2d 907, 912 (7th Cir.), cert. denied, 329 U.S. 721, 67 S.Ct. 57, 91 L.Ed. 125 (1946); O. & W. Thum Co. v. Dickinson, 245 F. 609, 622-623 (6th Cir. 1917), cert. denied, 246 U.S. 664, 38 S.Ct. 334, 62 L.Ed. 928 (1918); Revlon, Inc. v. Regal Pharmacy, Inc., 29 F.R.D. 169, 177 (E.D.Mich. 1961).
 
 
 28
 In view of our determination that the payments in question violate Section 2(c), there is no occasion for considering the allegations as to Sections 2(d) and 2(e). See Rowe, op. cit. supra, 337-338.
 
 
 29
 The order granting summary judgment for the defendants is reversed and the case is remanded with directions to ascertain plaintiff's damages and to enter summary judgment for the plaintiff.
 
 
 30
 MOORE, Circuit Judge (dissenting).
 
 
 31
 Since the majority concedes that no brokerage relationship existed between American and the jobbers awarded the discounts, the crucial issue raised is whether the legality of the discounts was properly tested under Section 2(c), the brokerage clause. The majority assert without citation of authority that the discounts are within the purview of Section 2(c) since it covers all discounts 'which are granted in connection with sales brought about by the persons who receive the discounts.' Moreover, they urge that Congress intended to invalidate payments such as those involved here because Section 2(c) is aimed at brokerage devices utilized to conceal price discrimination. Yet, rather than delineate the 'brokerage' aspects of American's discounts, the majority merely assume that such a characterization is appropriate. Finally, the majority, as does Empire, rely in part on a 1945 Fourth Circuit decision, Southgate Brokerage Co. v. FTC, 150 F.2d 607 (4th Cir. 1945), where the court held that discounts granted to a distributor who purchased and sold for his own account were unlawful under Section 2(c). However, as Judge Weinfeld noted in his opinion on the first motion in this case, in Southgate the applicability of Section 2(c) to the discounts granted was not in issue, i.e., there was no dispute as to whether they constituted an allowance in lieu of brokerage, as the situation is here. Empire Rayon Yarn Co. v. American Viscose Corp., 160 F.Supp. 334, 336 n. 5 (S.D.N.Y.1958). The sole issue in Southgate was whether the payments were made 'in return for services rendered' to the seller and, thus, excepted from Section 2(c).[1] In view of these analytical deficiencies and recent FTC and court decisions which reject interpretations of Section 2(c) as a rule of per se illegality, exemplified by the Southgate decision, and which refuse to apply Section 2(c) indiscriminately to any and all price concessions, I find the majority's formalistic application of Section 2(c) to the discounts granted by American completely unjustified.
 
 
 32
 As early as 1956 the FTC made clear that the applicability of Section 2(c) depends on the circumstances of each case when it refused to apply the section to price concessions admittedly coupled with the elimination of brokerage fees on the ground that the evidence failed to establish a connection between them. See Main Fish Co., 53 F.T.C. 88 (1956). A similar inclination to examine the substance of allegedly invalid price variations was demonstrated by the First Circuit in 1959 when it held that no violation of Section 2(c) occurred where a seller terminated broker services and changed to direct sales at reduced prices. Robinson v. Stanley Home Prods., Inc., 272 F.2d 601 (1st Cir. 1959). The court noted that 'the matter covered by section 2(c) is unearned brokerage, per se, not discrimination. * * * If * * * a manufacturer improperly discriminates between customers, section 2(a) will accomplish the purposes of the act.' Id. at 604. Cf. H.R. Rept. No. 2966, 84th Cong., 2d Sess. 97-98 (1956). Both of the above decisions were cited with approval by the Supreme Court in FTC v. Henry Broch & Co., 363 U.S. 166, 175-176, & n. 18, 80 S.Ct. 1158 (1960) where the Court held that under appropriate circumstances services rendered to a seller may justify a grant of price concessions. Id. at 173, 80 S.Ct. at 1163. Moreover, the Court pointed out that the 'in lieu of' provision of Section 2(c) is aimed at outright price reductions based on the partial or total elimination of brokerage services. Id. at 169 n. 5, 80 S.Ct. at 1160. Thus, it is apparent that in adjudging the appropriateness of applying Section 2(c) to particular transactions 'the question must be, what was the purpose of, or the reason for, the * * * (price variation).' Robinson v. Stanley Home Prods. Inc., supra at 603. See In re Whitney & Co., 273 F.2d 211, 215 (9th Cir. 1959); Thomasville Chair Co. v. FTC, 306 F.2d 541, 545-546 (5th Cir. 1962), 51 Calif.L.Rev. 215 (1963); Rowe, Price Discrimination Under the Robinson-Patman Act, 340-341 (1962).
 
 
 33
 The above mentioned 'purpose and effect' test was applied in two recent decisions, one by the Seventh Circuit, Central Retailer-Owned Grocers, Inc. v. FTC, 319 F.2d 410 (7th Cir. 1963), and one by the FTC, Edward Joseph Hruby, Trade Reg. Rep. (Transfer Binder, FTC Complaints, Orders, Stipulations 1961-1963) P16225 (1962), wherein Section 2(c) was deemed inapplicable to price discounts granted directly to distributors in consideration of their performance of distribution services. These decisions illustrate well the impropriety of the majority's application of Section 2(c) to the discounts granted by American in the present case and demonstrate 'a willingness to discard the subservience to form and nomenclature that dominated past brokerage enforcement.' Comment, 38 N.Y.U.L.Rev. 768, 777 (1963); see Rowe, Price Discrimination Under the Robinson-Patman Act (1964 Supplement) 69-78 (1964); Comment, 42 N.C.L.Rev. 457 (1964). In Central, Retailer-Owned Grocers, Inc., a cooperative purchasing organization, the members of which were associations of independent grocers, purchased materials from a supplier and obtained repayment from the members plus a markup to cover its operating costs. It received price concessions from the suppliers which were not granted to brokers selling directly to Central's members. At the end of each year, if any funds had accumulated, Central passed them on to the members in the form of patronage dividends. The court held that the concessions did not violate Section 2(c) because they were not based on savings in brokerage expenses but, rather, were made in consideration of the savings inherent in Central's method of doing business. In particular, the court noted that Central obtained the favorable prices because it assured the suppliers of a steady volume of business; removed credit risks; and eliminated billing expenses by providing a central office for payment. Central Retailer-Owner Grocers, Inc. v. FTC, supra, at 414. Similarly, the FTC in Edward Joseph Hruby looked to the distribution services performed by a distributor receiving price discounts to exonerate him from liability under Section 2(c). Commissioner Elman's opinion characterized the price concessions as 'functional discounts' which did not pass on brokerage savings to the distributor and stressed the fact that the distributor performed 'a legitimate and useful economic function in the channels of distribution' by assuming risks of collection and loss in transit; by servicing small unit purchasers (he took title to the goods and resold them on his own account); and by maintaining and operating warehouses stocked with substantial quantities of the suppliers' products. Edward Joseph Hruby, supra at 21051-21052. The FTC also noted that the discount enabled the distributor to resell to customers at a profit. Id, at 21052.
 
 
 34
 These decisions demonstrate that a price discount should not be treated as 'an allowance 'in lieu of' brokerage if it is causally conceived in considerations other than a saved commission or fee.' Rowe, supra, 341 (1962). The reliance by the Seventh Circuit and the FTC on evidence of a distributor's business methods and the resultant advantage to the supplier of gaining entrance to an otherwise impractical market to rebut inferences that discounts were causally related to a reduction in brokerage services is sound, especially in light of the 'purpose and effect' test enunciated in Robinson v. Stanley Home Prods., Inc., supra, and approved by the Supreme Court in FTC v. Henry Broch & Co., supra. See Comment, 32 Geo.Wash.L.Rev. 663, 669 (1964); cf. Rowe, 1964 Supplement, supra, 74-75. See generally 38 N.Y.U.L.Rev. 768 (1963). Moreover, approval of the compensation of a distributor by a supplier for distribution services rendered, in effect constitutes a rejection of Southgate Brokerage Co. v. FTC, supra, and undermines its value as a precedent.[2] See Edward Joseph Hruby, supra at 21054-21056 (MacIntyre, Comm., dissenting); 38 N.Y.U.L.Rev., supra at 775-776; Rowe, 1964 Supplement, supra at 75 n. 56.
 
 
 35
 Recognition of the vital economic functions performed by distributors reselling to small wholesalers by the courts and the FTC is long overdue. Comment 42 N.C.L.Rev. 457, 465; see Comment 51 Calif.L.Rev. 215, 219 & n. 31 (1963). Edwards, The Price Discrimination Law 150-52 (1959). 'The refusal to recognize this distributive function results either in depriving small buyers of a source of supply or in compelling them to pay a higher price than their competitors in buying from a distributor * * * to whom the manufacturer is forced to sell at the same price as direct buyers.' Austin, Price Discrimination and the Small Business Man, in 16 ABA Section of the Antitrust Law 94, 102-103 (1960). Business realities and the necessity for competition in the channels of distribution demonstrate the desirability of assessing the competitive effect of discounts granted to distributors with refernce to the less restrictive standards that have developed under Section 2(a), the general price discrimination provision, rather than Section 2(c). See Comment, 42 N.C.L.Rev., supra at 465.
 
 
 36
 The jobbers receiving discounts from American here performed distribution services identical to those referred to in Central Retailer-Owned Grocers, Inc. and Hruby, Edward Joseph, i.e., they assumed credit risks; serviced small unit purchasers; and maintained and operated warehouses storing American's products. In effect, they provided the means by which American was able to reach a market which, in the absence of the services rendered, it would not have been economically feasible to enter. Empire contends that the conditional nature of the discounts, i.e., the fact that they were not granted outright to the jobbers, conclusively demonstrates that they were not granted outright to the jobbers, conclusively demonstrates that they were not granted in consideration of the jobbers' functional utility. However, it should be noted that the resales were made at American's list price at the time of resale so that the jobbers' profit margin was subject to change in accordance with American's price changes. Moreover, the record supports a finding that the jobbers were engaged to service a particular market, to wit, small wholesalers. The mere fact that the discount was granted 'after the fact' does not render unreasonable the conclusion that they were granted to provide an incentive and compensation for the performance of a vital economic function.
 
 
 37
 In sum, the majority's disposition does not comport with the facts and 'stretches Section 2(c) * * * far beyond the limits of its language and manifest purpose, to a point where it now threatens to swallow up much of the territory covered by the more general statutory provisions which it was intended to supplement.' Central Retailer-Owned Grocers, Inc., Trade Reg.Rep. (FTC Complaints, Orders, Stipulations 1961-63) P15896 at 20717 (1962) (Elman, Comm., dissenting). As the majority concede, there is no problem of 'dummy' brokerage in this case. Moreover, the discounts do not come within the 'in lieu of brokerage' provision of Section 2(c) for they were not demonstrated to be direct price reductions 'based on the theory that fewer brokerage services were needed in sales to these particular buyers, or that no brokerage services were necessary at all.' FTC v. Henry Broch & Co., supra, 363 U.S. at 169 n. 5, 80 S.Ct. at 1160. As in Edward Joseph Hruby and Central, Retailer-- Owned Grocers, Inc. the discounts were 'proximately caused,' i.e., causally related, by the performance of legitimate distribution functions and services.[3]
 
 
 38
 It is apparent, as Judge Murphy noted below, that Empire's objection to the discounts is in essence a claim of price discrimination which, contrary to the majority, was not effected by 'brokerage devices' and is not cognizable under Section 2(c). This is not to say, however, that the price differentials are exempt from scrutiny under Section 2(a). Their legality depends on the criteria governing price discriminations by sellers under Section 2(a) and their receipt by buyers under Section 2(f), i.e., if they are anti-competitive in effect and if the defenses of cost justification or good faith meeting of competition are not established, they would be unlawful. However, 'where, as here, the allegations of fact relate only to a 2(c) violation * * * (it would be improper to) read in the possibility that the venture complained of may * * * amount to a 2(a) price discrimination * * *.' Empire Rayon Yarn Co. v. American Viscose Corp., 238 F.Supp. 556, 560 (S.D.N.Y.1965).
 
 
 39
 In final analysis, from the correspondence between the parties and the record, the purpose of this lawsuit is all too clear. By its abandonment of its section 2(a) claim, i.e., price discrimination, Empire impliedly recognized that it did not wish to risk the factual defenses which American might successfully interpose thereunder. Empire's sole purpose was to force itself upon American as a distributor performing the functions of Malina, Gutner Brothers and Shawmut. American, exercising its supposed right (which might well be denominated constitutional) to select its own appointees in this particular field, had advised Empire that as a matter of business judgment 'for the present at least this Corporation will not appoint any additional jobbers.' Empire then resorted in effect to the in terrorem position or threat of-- unless you add us as a distributor, we will sue you. Empire's real complaint was a price discrimination, section 2(a), violation which it originally alleged. Unwilling to pursue its action under that section and relying upon the label '5% Discount' as bringing it under section 2(c), (e) and (f), Empire sought to mold the factual situation to the contour of these sections.
 
 
 40
 The courts should be ever zealous to enforce the laws designed to promote active and healthy competition which, in theory at least, should redound to the benefit of the public and the various business organizations serving the public. However, the courts should be ever watchful lest under the guise of law enforcement bodies they become the instrumentalities of special interests which seek to use the law and the courts for their own particular benefit. This aspect of the present case was noted by a most discerning judge as appears in his decision upon the original summary judgment motion, wherein he said: 'Somewhat anomalously, based upon its assertion that it has the necessary facilities and qualifications to perform for American the jobbing services to the same extent as the jobber defendants, the plaintiff seeks the same discount which, if in fact is discriminatory, would in turn discriminate against other customers of American who might claim to be qualified to be accorded a jobber classification.' Weinfeld, D.J., in Empire Rayon Yarn Co. v. American Viscose Corp., 160 F.Supp. 334, 336 (S.D.N.Y.1958).
 
 
 41
 Because I believe that the decision of the majority is at variance with the purpose of section 2(c), with the facts which govern the relationship between American and its three distributors, with the decisions of the courts and the FTC interpreting this phrase of section 2(c) and with what should be the policy of the courts of not forcing unwanted distributors upon unwilling business organizations, I dissent and would affirm the order appealed from.
 
 
 
 [1]
 Clayton Act 2(c), (d), (e), 49 Stat. 1527 (1936), 15 U.S.C. 13(c), (d), (e) (1964), quoted in notes 6-8 infra
 
 
 [2]
 American also entered into a third contract with Shawmut, Inc. on December 30, 1953
 
 
 [3]
 See note 2 supra
 
 
 [4]
 Empire dismissed its action as against Shawmut, Inc., without prejudice as to its action against the other defendants in 1963
 
 
 [5]
 49 Stat. 1526 (1936), 15 U.S.C. 13(a) (1964)
 
 
 [6]
 'That it shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.' 49 Stat. 1527 (1936), 15 U.S.C. 13(c) (1964)
 
 
 [7]
 'That it shall be unlawful for any person engaged in commerce to pay or contract .for the payment of anything of value to or for the beneft of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available in proportionally equal terms to all other customers competing in the distribution of such products or commodities.' 49 Stat. 1527 (1936), 15 U.S.C. 13(d) (1964)
 
 
 [8]
 'That it shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.' 49 Stat. 1527, 15 U.S.C. 13(e) (1964)
 
 
 [9]
 38 Stat. 731 (1914), 15 U.S.C. 15 (1964)
 
 
 [10]
 38 Stat. 737 (1914), 15 U.S.C. 26 (1964)
 
 
 [11]
 The district court's opinion is confusing on this point, because at another place (in the discussion of Sections 2(d) and (e)) the court says: 'American pays no money as compensation for services or facilities furnished by the jobber defendants. Empire's * * * contention under 2(d) that the discount represents a payment for services * * * is specious.' 238 F.Supp. at 560-561
 
 
 [1]
 See also Western Fruit Growers Sales Co. v. FTC, 322 F.2d 67, 68 (9th Cir. 1963). Other decisions relied on by Empire are also not controlling here for they involved (a) the admitted receipt of brokerage payments by buyers' agents and raised issues concerning whether the buyers actually controlled the recipients of the payments or whether the payments were justifiably granted 'for services rendered' the seller, see Modern Marketing Service Inc. v. FTC, 149 F.2d 970 (7th Cir. 1945); Webb-Crawford Co. v. FTC, 109 F.2d 268 (5th Cir.), cert. denied, 310 U.S. 638, 60 S.Ct. 1080, 84 L.Ed. 1406 (1940); Quality Bakers of America v. FTC, 114 F.2d 393 (1st Cir. 1940); Oliver Bros. v. FTC, 102 F.2d 763 (4th Cir. 1939); Biddle Purchasing Co. v. FTC, 96 F.2d 687 (2d Cir.), cert. denied, 305 U.S. 634, 59 S.Ct. 101, 83 L.Ed. 407 (1938); and (b) payments made directly to a buyer in lieu of illicit brokerage previously paid to his agent. Great Atlantic & Pacific Tea Co. v. FTC, 106 F.2d 667 (3d Cir. 1939), cert. denied, 308 U.S. 625, 60 S.Ct. 380, 84 L.Ed. 521 (1940)
 
 
 [2]
 This decision and its progeny have not only been criticized for adopting an inflexible construction of Section 2(c), see Rowe, Price Discrimination Under the Robinson-Patman Act 357-59 (1962); Austin, Price Discrimination and Related Problems Under the Robinson-Patman Act 114-116 (1959); Law, The Performance of Distribution Functions as Legal Justification for Price Differentials Under the Robinson-Patman Act, 69 Dick.L.Rev. 39 (1964), but also for adopting a construction which is inconsistent with broader antitrust principles in that it granted a legal monopoly to one type of middleman, clogged competition in distribution channels and exacted a tribute 'from the consumer for the benefit of a special class.' Att'y Gen. Nat'l Comm. Antitrust Rep. 191-193 (1955); Edwards, The Price Discrimination Law 151 (1959)
 
 
 [3]
 The 'for services rendered' proviso in 2(c) could have been invoked to dispose of this appeal for FTC v. Henry Broch & Co., 363 U.S. 166, 80 S.Ct. 1158 (1960) 'indicated sympathy with some reassessment of the 'for services rendered' clause,' Rowe, supra at 353 (1962), which many considered a dead letter in view of Southgate Brokerage Co. v. FTC, 150 F.2d 607 (4th Cir. 1945), see Rowe, supra at 350 (1962); Austern, Section 2(c), CCH Robinson-Patman Act Symposium 37 (1946). The discounts here, moreover, could properly be treated as granted 'for services rendered' to American. That avenue of analysis, however, has been rejected because it is too circuitous and prevents the inquiry from focusing on the ultimate issue, viz., at what point should 2(a), the general price discrimination provision, yield to 2(c), the brokerage provision? This issue should be resolved by restricting the operation of 2(c) to those payments demonstrated to be causally related to either partial or total elimination of brokerage services, with the caveat that legitimate variations in brokerage fees, i.e., those based on genuine differences in cost, may be passed on in the form of lower prices. Thomasville Chair Co. v. FTC, 306 F.2d 541 (5th Cir. 1962); cf. FTC v. Henry Broch & Co., supra. This rule embodies a frank recognition of the legitimate economic function performed by intermediate distributors and the need for fostering competition in the channels of distribution which is best served by testing discounts under the less restrictive standards of 2(a)